UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————

KERRY KOTLER,

                                        Plaintiff,

                v.                                              9:09-CV-1443 (MAD/ATB)

BRIAN FISCHER, et al.,

                                        Defendants.

———————————————————————

KERRY KOTLER, Plaintiff *pro se*
MICHAEL McCARTIN, Ass't Attorney General for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## AMENDED REPORT-RECOMMENDATION

This matter was referred to me for Report and Recommendation by Hon. Mae
A. D'Agostino, U.S. District Judge, on June 30, 2011, pursuant to 28 U.S.C. § 636 (b)
and Local Rules N.D.N.Y. 72.3(c).  Plaintiff's *pro se* complaint (Dkt. No. 1) seeks
monetary damages and injunctive relief, under 42 U.S.C. § 1983, for alleged
violations of his constitutional rights while he was confined by the New York State
Department of Correctional Services ("DOCS").[1]  Plaintiff primarily claims that he
was subjected to retaliation and denied due process by various DOCS employees in
connection with a disciplinary proceeding conducted at the Upstate Correctional
Facility ("Upstate") in mid-2007.

Presently before this court is defendants' motion for summary judgment,

---

[1] On April 1, 2011, DOCS and the New York State Division of Parole were merged into
one agency, named the New York State Department of Corrections and Community Supervision.
Because the events relevant to this suit occurred before the merger, I will refer to New York
State's corrections agency as "DOCS."

pursuant to Fed. R. Civ. P. 56, filed on June 30, 2011.  (Dkt. No. 71).  On July 14,

2011, Judge D'Agostino entered a stipulation and order of discontinuance, dismissing,

with prejudice, plaintiff's claims against defendants Santamore, English, and

McSweeney.  (Dkt. No. 75).  Plaintiff filed a response to the defendants' motion,

which included a memorandum of law and detailed statement of material facts, both

dated October 25, 2011, as well as voluminous supporting exhibits.  (Dkt. Nos. 79-1 -

79-5).  In a supplemental statement, dated October 27, 2011, plaintiff informally

withdrew all claims against defendants Fischer, Woods, and Tirone.  (Dkt. No. 79 at

1-2).[2]  The defendants thereafter filed a reply, consisting of a largely conclusory

response to plaintiff's statement of material facts.  (Dkt. No. 82).

　　　　For the reasons set forth below, this court recommends denying, without

prejudice to renewal, the summary judgment motion as to the due process claims

against defendant LaMora, the disciplinary hearing officer at Upstate, and defendant

Quinn, who denied plaintiff's appeal of the disciplinary sanctions imposed.  The court,

however, recommends dismissal of all remaining defendants and claims, including

plaintiff's retaliation claims against defendants Gregory, Bellamy, LaMora, Quinn,

and Annucci.

---

[2] Plaintiff's supplemental statement noted that claims remained against only four
defendants–Gregory, Bellamy, LaMora, and Annucci–but failed to mention defendant Quinn,
who was named in the complaint and discussed in plaintiff's other papers in opposition to the
summary judgment motion.  (*Id.*)  As discussed further below, in light of plaintiff's *pro se* status,
and the ambiguity of his intentions with respect to defendant Quinn, the court has decided not to
recommend dismissal of all claims with respect to this defendant.

## I.    Factual Background[3]

In May 2007, plaintiff was transferred to Upstate, for alleged disciplinary infractions not related to the instant claims.  At that time, plaintiff had an unrelated civil rights action and a number of grievances pending against DOCS employees other than the named defendants in this action.  (Pl.'s Stmt. of Mat. Facts ¶¶ 2-14, Dkt. No. 79-1).  Starting in early June 2007, plaintiff wrote a series of letters to defendant Gregory–the Upstate Inmate Grievance Program ("IGP") Supervisor–and defendant Bellamy–the IGP Director–criticizing Ms. Gregory's handling of plaintiff's grievances.  (Pl.'s App. Exs. 3 & 4, Dkt. No. 79-3 at 17-27).

On June 22, 2007, plaintiff submitted, for photocopying at the Upstate library, a copy of a DOCS Form 2133 relating to a past grievance, which plaintiff had redacted to create a blank version of the form.  (Santamore Decl. ¶ 7, Dkt. No. 71-24).  Form 2133 is typically used to set forth the ruling of a facility Superintendent on a grievance, and has a block for the Superintendent's signature and a space at the bottom for the inmate to indicate his intention to appeal the Superintendent's decision to the DOCS Central Office Review Committee ("CORC").  (Bellamy Decl., Ex. A, Dkt. No. 71-12).  C.O. Santamore, who is no longer a defendant, asked Upstate IGP Supervisor Gregory whether inmates were allowed to have blank copies of Form 2133, and defendant Gregory advised that inmates were not allowed to possess that form in blank.  C.O. Santamore, after consulting with his supervisor, decided to file an inmate

---

[3] Additional details regarding the most pertinent facts, with additional supporting citations to the record, are set forth in sections III and IV below.

misbehavior report against plaintiff, charging him under a disciplinary rule that prohibits altering, forging, or counterfeiting any document, as well as distributing or possessing DOCS documents "without authorization." (Santamore Decl. ¶¶ 7-9 & Ex. A, Dkt. No. 71-25). After the misbehavior report was filed against plaintiff, but before the disciplinary hearing, defendant Gregory confirmed with her IGP supervisors, including defendant Bellamy, that they agreed that inmates were not allowed to possess Form 2133 in blank. (Gregory Decl. ¶¶ 8-11, Dkt. No. 71-19 & Ex. A, Dkt. No. 71-20).

Defendant LaMora presided over plaintiff's disciplinary hearing, at which C.O. Santamore and defendant Gregory testified. Plaintiff argued that defendant Gregory and others in the IGP were mistaken in their interpretation that DOCS rules prohibit inmates from possessing Form 2133 in blank. (Disc. Hrg. Tr. at 13-14, 21, Dkt. No. 71-28). He claimed that DOCS inmates had been allowed to possess blank copies of the form in order to appeal the denial of a grievance to CORC when the facility Superintendent did not review the denial on a timely basis. (Disc. Hrg. Tr. at 24-25). Plaintiff asserted that he tried to secure blank copies of Form 2133 from the library so that he could appeal, in good faith, a prior grievance for which he had not yet received a Superintendent's ruling. (Disc. Hrg. Tr. at 12-14).

Defendant LaMora, accepting the testimony of defendant Gregory that inmates were not allowed to possess blank copies of Form 2133, found plaintiff guilty on the misbehavior report, and sentenced him to 30 days of "keeplock" confinement, along with the suspension of certain other privileges. (Disc. Hrg. Tr. at 28). Defendant

4

Quinn reviewed and denied plaintiff's appeal of the disciplinary action against him. (Pl.'s App. Exs. 10-11, Dkt. No. 79-3 at 41-54).

Plaintiff claims that, as a result of the Progressive Inmate Movement System ("PIMS") in place at Upstate, he served significantly more than 30 days of disciplinary confinement as a result of the misbehavior report against him. (Pl.'s Stmt. of Mat. Facts ¶¶ 45-48 & App. Exs. 8-9, Dkt. No. 79-3 at 35-40). Plaintiff alleges, in considerable detail, how the conditions of his confinement at Upstate amounted to an "atypical and significant hardship." (Pl.'s Stmt. of Mat. Facts ¶¶ 137-171).

Plaintiff wrote numerous letters complaining to defendant Bellamy and DOCS Commissioner Fischer that the imposition of disciplinary sanctions against him were contrary to DOCS rules, were fundamentally unfair, and were the result of retaliation against him because of his extensive grievance-related activities. (Pl.'s App. Exs. 21-28, Dkt. No. 79-5 at 4-33). Both defendant Bellamy and defendant Annucci, the DOCS Executive Deputy Commissioner, replied to plaintiff. They advised plaintiff, in essence, that his recourse was limited to the appeal of the disciplinary action, which had already been decided, and that they would not or could not conduct any further investigation or take any other remedial action. (Pl.'s App. Exs. 22, 24, 26, 28).

## II.   **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary

judgment." *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56 (c)(1)(A). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-48.

"[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v.*

*Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")).  "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).

## III.   Due Process Claims Relating to Plaintiff's Disciplinary Hearing

The complaint claims that defendant LaMora violated plaintiff's due process rights because he was a biased hearing officer who conducted the hearing in an unfair and impartial manner.  The complaint further alleges that defendants Annucci and Quinn[4] denied plaintiff due process by ratifying and failing to correct the violations purportedly committed by the disciplinary hearing officer.  (Compl., Dkt. No. 1 at 16).  The court concludes that there are material issues of fact with respect to whether defendants LaMora and Quinn violated plaintiff's due process rights in connection with the disciplinary hearing because of the lack of adequate notice to plaintiff that his conduct violated DOCS disciplinary rules.

### A.   Legal Standards

Plaintiff raises various due process challenges to his disciplinary hearing.  To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges,

---

[4] The complaint makes the same allegation against defendants Fischer, Woods, and Tirone, but, as noted above, plaintiff has explicitly withdrawn the claims against those defendants.

and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).

In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The Second Circuit has explicitly avoided a bright line rule that a certain period of  confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000).  Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004).  A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon v. Howard*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement).  Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.  However, "SHU confinements of fewer than 101 days could constitute

8

atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d at 65 (citations omitted).  In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.*, 30 days–and there was no indication that the plaintiff endured unusual SHU conditions.  *Id*. at 65-66 (collecting cases).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)).  The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations.  *See, e.g., Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (state law violation does not necessarily rise to the level of a constitutional violation)*; Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred).  To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show

that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 426, 429-31 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

## B.   Liberty Interest

Defendants contend that the punishment imposed on plaintiff as a result of the June 22, 2007 misbehavior report and related disciplinary hearing was only 30 days of "keeplock"[5] and loss of package, commissary, and phone privileges, as reflected in the disposition of the disciplinary charges. (LaMora Decl. ¶¶ 6-7, Dkt. No. 71-26 & Ex. A, Dkt. No. 71-27 at 1). They argue that such punishment was not sufficiently serious to deprive plaintiff of a "liberty interest." (Defs.' Mem. of Law at 8-10, Dkt. No. 71-33 (citing, *inter alia*, *Brown v. Graham*, 9:07-CV-1353 (FJS/ATB), 2010 WL 6428251, at *9 (N.D.N.Y. Mar. 30, 2010) ("The federal district courts in New York, applying *Sandin*, have been consistent in holding that terms of SHU or "keeplock" of approximately 30 days or less, and the related loss of privileges, do not implicate a

---

[5] "Keeplock" is a form of disciplinary confinement where the inmate is confined to his own cell for the duration of the disciplinary sanction. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989). "Upstate is designated as a maximum-security facility that serves as 'Special Housing Unit Facility to house selected inmates serving disciplinary dispositions specifying assignment to a Special Housing Unit or keeplock.'" *Cardew v. Bellnier*, 9:09–CV–775 (GLS/ATB), 2010 WL 7139218, at *8 (N.D.N.Y. Dec. 9, 2010) (quoting DOCS Directive 0023) (Report-Recommendation), adopted, 2011 WL 3328632 (N.D.N.Y. Aug. 2, 2011). Because plaintiff was already confined in the disciplinary unit at Upstate at the time these sanctions were imposed, the conditions of his keeplock confinement would be comparable to SHU conditions.

liberty interest protected by the Due Process clause, even in the absence of detailed

factual development regarding the conditions of confinement.") (collecting cases)

(Report-Recommendation), adopted, 2011 WL 1213482 (N.D.N.Y. Mar. 31, 2011)).

    Plaintiff contends that, as a result of this disciplinary charge, his PIMS level[6]

was downgraded to Level I, requiring him "to serve a total of 58 days that he would

not have otherwise served in the disciplinary confinement unit at Upstate." (Pl.'s

Stmt. of Mat. Facts ¶¶ 45-48 & App. Exs. 8 & 9). Plaintiff claims that the disciplinary

hearing officer–defendant LaMora–knew that, as a result of his adjudication of

plaintiff's disciplinary charge, plaintiff would be required to serve considerably more

than 30 days in the Upstate disciplinary unit. (Pl.'s Stmt. of Mat. Facts ¶ 46).[7]

    Although defense counsel had advance notice, from plaintiff's deposition, that

he disputed that the punishment imposed on him as a result of the disciplinary charge

---

[6] "Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or 'PIMS,' intended to provide incentive and encourage behavioral adjustment for SHU inmates. . . . Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges." *Cicio v. LaMora*, 9:08-CV-431 (GLS/DEP), 2010 WL 1063875, at *1 (N.D.N.Y. Feb. 24, 2010 ) (Report-Recommendation), adopted, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010).

[7] Based on a declaration from a DOCS official in another case, this court summarized some of the rules applying to inmates at Upstate under the PIMS program: "Whenever an inmate enters Upstate, he is classified as a PIMS Level I inmate. . . . If an inmate is to progress from PIMS Level I to PIMS Level II, he must at a minimum have 30 days at Level I status with no disciplinary reports. . . . Movement from PIMS Level II to Level III requires at a minimum that the inmate must remain at Level II for 30 days with no disciplinary reports." *Smith v. Artus*, 9:07-CV-1150 (NAM/ATB), 2010 WL 3910086, at *21 (N.D.N.Y. Sept. 30, 2010). While not relying on this information from outside the current record in denying summary judgment here, it suggests that plaintiff has some basis for his unrebutted allegation that a hearing officer at Upstate would be aware of the collateral punitive consequences to an inmate from a guilty disposition on a disciplinary charge under the PIMS program.

was limited to 30 days of keep lock,[8] the defendants' summary judgment motion and supporting declarations do not address this factual issue.  In response to plaintiff's assertions in his Statement of Material Facts, defense counsel provided no substantive response other than referring to defendant LaMora's prior declaration, which merely recites the 30-day-keeplock penalty imposed in the formal disposition.  (Defs.' Resp. to Pl.'s Stmt. of Mat. Facts ¶¶ 45-48, Dkt. No. 82-1; LaMora Decl. ¶ 6).

In determining whether the disciplinary proceedings implicated a liberty interest protected by due process, the court must consider, *inter alia*, the interval of punitive confinement for which the defendants are "responsible."  *Sealey v. Giltner*, 197 F.3d 578, 587 (2d Cir. 1999).  The prison official who conducted a disciplinary hearing may, depending on the circumstances, be responsible for a longer period of punitive confinement than he formally imposed.  *Id.* at 587-88 (hearing officer was "responsible," not only for the 63 days in SHU plaintiff served between the time of the adjudication of the disciplinary charge and the subsequent reversal of that adjudication, but also 18 days plaintiff served before the hearing was concluded and 20 days between the reversal of the first hearing and the scheduling of the rehearing before a different officer).  Given the defendants' failure to address plaintiff's factual claims about the duration of the punitive confinement resulting from the disciplinary

---

[8] During his March 28, 2011 deposition, plaintiff claimed that he received more than 30 days in keeplock as a result of the disciplinary charges, because his security level was changed. (Pl.'s Dep. at 59-61, Dkt. No. 71-3).

hearing at issue,[9] the court finds that there is an issue of fact as to whether the defendants are responsible for a significant period beyond the 30 days of keeplock imposed. If, as plaintiff asserts, he served between 66 and 94 days of punitive confinement,[10] as a result of the disciplinary hearing, the issue of whether his liberty interests were infringed would require a more probing analysis of the conditions of his confinement. *See, e.g., Palmer v. Richards*, 364 F.3d at 66 (in this case–involving 77 days of punitive confinement–as in *Welch v. Bartlett*, 196 F.3d 389, 393-94 (2d Cir. 1999)–involving 90 days in SHU–the duration of punitive confinement was not, by itself, long enough to constitute an atypical and significant deprivation; but we must look to the actual conditions of confinement).[11]

---

[9] The court recognizes that the record reflects that plaintiff was originally transferred to the Upstate disciplinary unit for reasons unrelated to the disciplinary charges at issue in this case. (Pl.'s Stmt. of Mat. Facts ¶¶ 6, 12). The court also acknowledges that the record is unclear about some critical aspects of the conditions of plaintiff's confinement during the "extra" time that he was confined at the Upstate disciplinary unit as a result of the downgrade of his PIMS classification. For example, it is not clear whether plaintiff was confined in his cell for 23 hours per day beyond the original 30 days of keeplock. However, the defendants have not developed the record adequately to eliminate material issues of fact with respect to whether plaintiff's disciplinary confinement related to the relevant charges at Upstate implicated a due process liberty interest.

[10] The plaintiff has not been entirely consistent about the amount of "additional" time in punitive confinement attributable to the disciplinary action against him. During his deposition, plaintiff claimed that he was subjected to an additional 36 to 45 days beyond the 30-day keeplock sentence. (Pl.'s Dep. at 59-61). In his motion response, plaintiff appears to claim that he served an additional 58 days of punitive confinement. (Pl.'s Stmt. of Mat. Facts ¶ 48). In the absence of any substantive factual response from the defendants, the court must credit the plaintiff's factual assertions for the purposes of evaluating the summary judgment motion.

[11] The cases in this Circuit which grant or uphold summary judgment without detailed factual development regarding the conditions of confinement generally involve 30 days or less of punitive confinement, although a few cases involve slightly more than 30 days. *Palmer v. Richards*, 364 F.3d at 65-66 (collecting cases); *Brown v. Graham*, 2010 WL 6428251, at *9 (collecting cases).

In addition to raising factual issue about the duration of his punitive confinement, plaintiff also makes detailed factual assertions indicating that the actual conditions of his confinement at Upstate were substantially worse than those faced by the typical New York inmate in general population. *See Palmer v. Richards*, 364 F.3d at 66 (the conditions of punitive confinement should be compared "to the conditions imposed on the general prison population").  Plaintiff alleges, *inter alia*, that (1) he was required to bunk with an inmate who was clinically diagnosed as "bipolar schizophrenic with an extreme rage disorder"; (2) the cells were extremely noisy compared to general population cells he has inhabited; (3) he was exposed to constant smoke in his Upstate cell from other inmates who smoked or burned "wicks" of toilet paper used to light cigarettes; (4) he was deprived of personal property and supplies, including clothing, grooming and hygiene products, reading materials, and his typewriter (which required him to draft legal documents by hand, which was particularly difficult because of a prior injury to his hand); (5) his access to telephone calls and personal visits were restricted in ways that essentially precluded contact with his elderly, ill mother and his young daughter; (6) his access to legal materials was restricted in ways that impaired his ability to pursue legal actions, and impeded a timely filing in a planned Article 78 proceeding; (7) he was mechanically restrained whenever he was escorted out of his cell, including for personal visits; (8) he was deprived of or limited with respect to various other privileges, such television, and commissary, and was deprived of the ability to participate in various programs and social activities with other inmates.  (Pl.'s Stmt. of Mat. Facts ¶¶ 137-171).

The defendants' typical response to plaintiff's specific factual assertions regarding his actual conditions of confinement at Upstate was to "deny knowledge or information sufficient to form a belief as to the truth of the matter asserted, and respectfully assert that this allegation is not relevant to a proper resolution of the defendants' summary judgment motion in this action." (Defs.' Resp. to Pl.'s Stmt. of Mat. Facts ¶¶ 137-171). In some instances, the defendants' responded with a citation to a section of plaintiff's prior deposition where he discussed the conditions of his confinement in a way that was generally consistent with, albeit less detailed and a bit less dramatic than, the description in plaintiff's Statement of Material Facts. (*Id.*; Pl.'s Dep. at 60-66). While the defendants may be correct that some of the facts plaintiff alleges about the conditions of confinement at Upstate are not particularly relevant to a determination of whether he was deprived of a liberty interest, defense counsel did not provide any argument or legal authority to support their position. In any event, given the factual uncertainty about the duration of plaintiff's punitive confinement, some of his unrebutted factual allegations are sufficient to create a material issue of fact as to whether the actual conditions of plaintiff's confinement at Upstate implicated a liberty interest. *See, e.g.*, *Palmer v. Richards*, 364 F.3d at 66[12]; *Welch v.*

---

[12] "The atypical and significant hardship this plaintiff suffered due to his wrongful confinement in S.H.U. was **being deprived his property, [i.e.,] personal clothing, grooming equipment, hyg[i]enic products and materials, reading materials, writing materials,** school books, **personal food** and vitamin supplements, family pictures as well as **personal correspondences, being mechanically restrained whenever this plaintiff was escorted, and being out of communication from his family**, . . . . This affidavit, which has not been contradicted, raises genuine questions of material fact as to the conditions under which Palmer was confined and how those conditions compared to the conditions imposed on the general prison population." *Id.* (emphasis added).

15

*Bartlett*, 196 F.3d at 393-94.[13]

While not excusing defense counsel's failure to respond more fully to plaintiff's factual statements in opposition to the summary judgment motion, the court recognizes that the defendants may be able to marshal facts that undermine plaintiff's position that the disciplinary proceedings in this case implicated a liberty interest. Accordingly, the court denies summary judgment without prejudice to defendants making another such motion, if it can be documented sufficiently to overcome plaintiff's factual assertions.  See *Palmer v. Richards*, 364 F.3d at 68 n. 6 (we do not foreclose the possibility that Richards might prevail on a subsequent motion for summary judgment); *Welch v. Bartlett*, 196 F.3d at 394-95.

## C.   Notice/Vagueness

"Due process requires prison officials to provide inmates with adequate notice of what conduct is prohibited."  *Collins v. Goord*, 581 F. Supp. 2d 563, 578 (S.D.N.Y. 2008) (citing, *inter alia*, *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir.1999).  "'Courts have recognized prisoners' substantive due process claims that allege that prison rules failed to provide adequate notice of prohibited conduct.  The underlying rationale . . . [is that] inmates must be free to avoid prohibited conduct, and prison regulations must

---

[13] In *Welch*, the plaintiff's affidavit specifically alleged that, beyond the normal SHU conditions, he endured "far inferior" hygienic conditions in SHU than prisoners in the general population and that he received "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes."   *Id.* at 393.  The Second Circuit found, accepting these allegations as true for purposes of opposition to a summary judgment motion, that these facts would be sufficient to permit a conclusion of atypical and significant deprivation, notwithstanding that the plaintiff was only sentenced to 90 days in SHU, because "[t]he record d[id] not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances."  *Id.* at 394.

therefore place them on notice . . . .'" *Williams v. Fischer*, 08-CV-413 (TJM/DRH), 2010 WL 3910129, at *10 (N.D.N.Y. Aug. 17, 2010) (quoting *Leitzsey v. Coombe*, 998 F. Supp. 282, 289 (W.D.N.Y. 1998)).  A disciplinary rule "is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation and encourages arbitrary and erratic behavior on the part of the officials charged with enforcing the rule."  *Id.* (citing *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995)).

Because *pro se* pleadings must be interpreted to raise the strongest arguments they suggest, the court construes plaintiff's complaint as raising a due process claim that he was deprived of adequate notice that his efforts to obtain a blank Form 2133 would subject him to discipline under DOCS rules.  The complaint contains two explicit claims for relief based on alleged due process violations by various defendants.  (Dkt. No. 1 at 16).  Moreover, the plaintiff's prior factual allegations make clear that he claimed a good faith belief that DOCS regulations, policies, and procedures allowed inmates to possess and use a blank Form 2133 in connection with the appeal of a grievance in the absence of a timely response by the Superintendent.  (Dkt. No. 1 at 10-11).  Although defense counsel apparently did not construe the complaint to raise a claim based on inadequate notice,[14] the defendants are not

---

[14] During his deposition, plaintiff explicitly raised the issue of notice:  "There was no written regulation that prohibited me from having that form that I'm aware of prior to June 22nd, 2007.  And if there was, I think there was some responsibility on the Department to put me on notice of that fact."  (Pl.'s Dep. at 48).

prejudiced by the court's interpretation of the *pro se* plaintiff's due process claim.  *Cf.*
*Chatin v. Coombe*, 186 F.3d at 86 (the defendants could not identify any prejudice
from the granting of plaintiff's post-trial amendment of the complaint to add a due
process claim that he was deprived of fair notice that his conduct violated DOCS
disciplinary rules, when "the core issue in this case has never changed, that is, whether
the defendants violated the plaintiff's constitutional rights by punishing him for
violating" a DOCS rule).

There is no dispute that the conduct for which plaintiff was disciplined
consisted of redacting a completed DOCS Form 2133 relating to another grievance
and submitting it to the law library for photocopying in order to obtain a blank version
of that DOCS form.  (Gregory Decl. ¶ 6, Dkt. No. 71-19).  Plaintiff was charged with,
and found guilty of, violating DOCS Rule 116.12, which states:  "An inmate shall not
alter, forge, or counterfeit any document.  An inmate shall not distribute or be in
possession of any departmental document without authorization."  (LaMora Decl. ¶¶
4, 5 (quoting N.Y. Comp. Codes R. & Regs., tit. 7, § 270.2, Rule 116.12)).

DOCS Form 2133 is generally used to record the decision of a facility
Superintendent with regard to an appeal, by an inmate, of a denial of a grievance by
the Inmate Grievance Resolution Committee ("IGRC").  The form contains a space at
the bottom where the inmate can indicate his intention to appeal a negative decision of
the Superintendent to the DOCS Central Office Review Committee ("CORC").

(Bellamy Decl. ¶ 11, Dkt. No. 71-11 & Ex. A).[15]   However, as plaintiff argued, during

his disciplinary hearing and thereafter, there are circumstances under which DOCS

Directives 4040 ("Inmate Grievance Program") purports to require an inmate to

initiate an appeal to CORC on a blank Form 2133–for example, if the inmate has not

received a timely Superintendent's decision with respect to a grievance alleging

harassment by the staff.  (Disc. Hrg. Tr. at 13-14, 21, 23; Pl.'s Stmt. of Mat. Facts ¶¶

32, 38; DOCS Directive 4040 § 701.8 (g), Dkt. No. 71-15 at 12).  Plaintiff also argued

at the disciplinary hearing, and supported with documentation in his opposition to the

summary judgment motion, that he had previously been provided blank copies of

Form 2133 by DOCS officials so that he could initiate appeals to CORC.  (Disc. Hrg.

Tr. at 25; Pl.'s Stmt. of Mat. Facts ¶¶ 33-34, 120-136 & App. Exs. 29-34, Dkt. No. 79-

5 at 34-45).

The defendants did not respond substantively to plaintiff's detailed factual

allegations indicating that he and other DOCS inmates were often allowed to possess

and use blank copies of Form 2133 to pursue grievance appeals.  (Defs.' Resp. to Pl.'s

Stmt. of Mat. Facts ¶¶ 33-34, 120-136).[16]  In response to plaintiff's claim that no

---

[15] The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the IGRC.  N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC may be appealed to the Superintendent of the facility.  *Id.* § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the CORC.  *Id.* § 701.5(d).

[16] The defendants' response to almost all of plaintiff's allegations of this sort was to "deny knowledge or information sufficient to form a belief as to the truth of the matter asserted, and respectfully assert that this allegation is not relevant to a proper resolution of the defendants' summary judgment motion in this action."  (*Id.*).

19

DOCS inmate had been previously disciplined for attempting to photocopy or possess Form 2133 in blank, the defendants responded that they had insufficient knowledge or information to form a belief as to the truth of the allegation.  (Pl.'s Stmt. of Mat. Facts ¶ 74; Defs.' Resp. to Pl.'s Stmt. of Mat. Facts ¶ 74).  Given the plaintiff's unrebutted factual statements about DOCS' inconsistent position with respect to whether inmates were authorized to have sole possession of this blank form, the court concludes that there are material issues of fact relating to whether the applicable DOCS disciplinary rule, as applied to plaintiff, was unconstitutionally vague, in that it "encourage[d] arbitrary and erratic behavior on the part of the officials charged with enforcing the rule." *Giano v. Senkowski*, 54 F.3d at 1057.

The officer who filed the misbehavior report against plaintiff (who has been dismissed as a defendant) and the disciplinary hearing officer–defendant LaMora– relied upon the interpretation of the applicable DOCS Directives by representatives of the Inmate Grievance Program ("IGP")–including defendants Gregory and Bellamy–to determine that DOCS inmates were not authorized to have sole possession of blank copies of Form 2133.  (Disc. Hrg. Tr. at 8-14, 17-18, 28).[17]  In support of the motion

---

[17] DOCS Rule 116.12 prohibited altering, forging, or counterfeiting any document, as well as unauthorized distribution or possession of a DOCS document.  A violation of Rule 116.12 for altering, forging, or counterfeiting a document requires proof that the inmate operated with an intent to defraud.  *Costantino v. Goord*, 38 A.D.3d 659, 660, 831 N.Y.S.2d 538, 539 (2d Dept. 2007) (the word "alter" in DOCS Rule 116.12 carries the same intent to defraud or deceive as do its companion words "forge" and "counterfeit").  Plaintiff openly sought the assistance of Officer Santamore to obtain blank copies of Form 2133 so he could initiate an appeal of a grievance denial for which the deadline for the Superintendent's decision was fast approaching.  (Pl.'s Stmt. of Mat. Facts ¶¶ 23-26).  There is no indication in the record that plaintiff had any intention of forging the Superintendent's decision or signature.  Under the circumstances of this case, plaintiff would not have violated Rule 116.12 by altering the form to create a blank version

for summary judgment, defendant Bellamy–the DOCS Director of IGP–provided a declaration which explained, in detail, the basis for her conclusion that DOCS policies and directives precluded inmates from possessing Form 2133 in blank.  (Bellamy Decl. ¶¶ 10-14 & Ex. D, Dkt. No. 71-15).  Her conclusion required close interpretation of several subsections of DOCS Directive 4040, which, in the court's view, would not be easily reconciled by a lay inmate.

In *Chatin v. Coombe*, the Second Circuit considered whether a DOCS disciplinary rule barring "[r]eligious services, speeches or addresses by inmates other than those approved by the Superintendent" was unconstitutionally vague as applied to silent, individual prayer.  *Id*. at 84 (quoting DOCS Rule 105.11).  The panel found that the rule was vague, rejecting DOCS' argument that the rule's vagueness was cured by an internal DOCS Directive and memorandum from prison staff, which together clarified that silent prayer was covered by the rule.  *Id*. at 87-89, 91.  *Chatin* held that prisoners are not required to integrate multiple directives in order to divine the rules governing their conduct.  *Id*. at 88-89.

In *Farid v. Ellen*, an inmate was charged with violating, *inter alia*, the prison's general ban on contraband (DOCS Rule 113.23) as a result of his possession of a

---

unless possession of the blank form was unauthorized.  In fact, hearing officer LaMora acknowledged that the fact that inmates were not authorized to possess Form 2133 in blank was a critical element of the violation.  (Disc. Hrg. Tr. at 15, 25-26, 28).  *See Id.* (there is no evidence that the petitioner customized his grievance form with the intent to deceive or defraud; the hearing officer understood that the petitioner intended no deception when he "accused" the petitioner of having altered the form "solely for your use in submitting grievances").  At a minimum, there are issues of fact as to whether or not plaintiff's motivation for attempting to obtain the blank form suggested an awareness that his conduct might violate a prison disciplinary rule.

pamphlet criticizing New York's parole policies.  593 F.3d 233, 237-38 (2d Cir. 2010).  DOCS argued that the pamphlet constituted contraband because it violated the bylaws of the prison-approved organization, which included the plaintiff as a member, and which produced the pamphlet.  The Second Circuit agreed with the District Court "that these rules were unconstitutionally vague as applied to Farid, both because they failed to give him adequate notice and because they failed adequately to constrain the discretion of the prison officials who had the power to impose them."  *Id.* at 241.  Relying heavily on *Chatin*, the *Farid* panel reasoned:

> There is nothing in the rule indicating that materials which violate a prison organization's internal by-laws are contraband in violation of the prison's rules . . . .  Accordingly, unless [Farid] had other reasons to know that what he did was against *prison* rules, these regulations were improperly applied to him.

*Id*. at 241-42 (emphasis in the original).

The court concludes that, on the current record, there are genuine issues for trial regarding whether the DOCS disciplinary rule, as applied to plaintiff, was unconstitutionally vague in that "persons of common intelligence must necessarily guess at its meaning and differ as to its application, or [in that] it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation . . . ."  *Giano v. Senkowski*, 54 F.3d at 1057.  Plaintiff was apparently expected by the defendants to parse seemingly conflicting provisions of DOCS Directive 4040, and divine, notwithstanding his alleged prior experience of possessing blank copies of Form 2133 with impunity, that he would be subject to discipline under Rule 116.12 for creation of or possession of "unauthorized" DOCS documents.  Based on *Chatin*

and *Farid*, the court cannot recommend summary judgment on plaintiff's due process claims against defendants LaMora and Quinn,[18] particularly given the defendants' failure to respond to numerous, material factual allegations by plaintiff.

These defendants would also not be entitled to summary judgement based on qualified immunity.  The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[19]  In *Farid v. Ellen*, the Second Circuit reversed the district court's grant of summary judgment, rejecting the finding of the lower court that the defendants in that case were clearly entitled to qualified immunity.  593 F.3d at 246-47.  In doing so, the panel ruled that, "in light of *Chatin*, a jury could very well decide that it is unreasonable for a prison official to act on the belief that violation of a prisoner organization's internal by-laws can properly subject a prisoner to discipline under the prison's rules."  *Id.*  Similarly, a jury in this

---

[18] *See Farid v. Ellen*, 593 F.3d at 238, 239 (defendants denied summary judgment on plaintiff's claim that he was unconstitutionally disciplined under a vague DOCS rule included hearing officer and DOCS official who handled the appeal of plaintiff's disciplinary hearing).  In his Supplemental Statement Opposing Defendants' Summary Judgment Motion (Dkt. No. 79), plaintiff withdrew his claims against various named defendants, without any mention of defendant Quinn.  Plaintiff then stated: "The defendants that remain in the action are now just four individuals, *i.e.*, CHRISTINE GREGORY, KAREN BELLAMY, RANDY LaMora, AND ANTHONY ANNUCCI."  (Supp. Stmt. ¶ 7).  Given the inconsistencies in plaintiff's Supplemental Statement with respect to defendant Quinn, and the fact that this defendant, who handled the appeal of plaintiff's disciplinary sanctions, would appear to be an appropriate defendant on the surviving due process/lack of notice claim, the court will not recommend dismissal of Capt. Quinn as a defendant.

[19] The general legal standards relating to qualified immunity are discussed in more detail in section IV A 3., below.

case could find that it would have been unreasonable for the hearing officer and the official who denied plaintiff's disciplinary appeal to act on the belief that a lay inmate should have understood, based on a nuanced interpretation of various provisions of DOCS Directive 4040, that he could be disciplined for his attempts to obtain a blank copy of DOCS Form 2133.[20]

With respect to defendant Annucci, the court recommends a grant of summary judgment on plaintiff's due process claim based on his lack of "personal involvement."  The basis for this recommendation is detailed in section IV B 5., below, in the context of the court's discussion of plaintiff's retaliation claim.

### D.      Other Due Process Objections to the Disciplinary Hearing

The complaint claims, without much in the way of supporting factual allegations, that defendant LaMora served as a "biased" hearing officer and conducted the disciplinary hearing in "an unfair and impartial manner."  (Compl., Dkt. No. 1 at 16).  The complaint further alleges that defendants Annucci and Quinn violated plaintiff's due process rights by failing to modify or overturn the results of his disciplinary hearing, in response to plaintiff's appeal and various grievances and complaints.  (*Id.*).

---

[20] There is no indication in the record that, prior to being issued the relevant misbehavior report, plaintiff had any actual notice that DOCS inmates were not authorized to possess Form 2133 in blank.  *Cf. Young v. Goord*, 192 F. Appx. 31, 33-34 (2d Cir. 2006) (prison officials who personally notified an inmate, before he was disciplined, of the change effected by a revised directive and an implementing memorandum on a DOCS disciplinary rule, could reasonably believe that their application of the new disciplinary policies was consistent with due process standards articulated by the Second Circuit, because the officials did not expect the inmate himself to reconcile the text of these different documents) (distinguishing *Chatin*).

In his brief in opposition to the instant motion, plaintiff elaborated on the due process claims.  His primary basis for alleging bias was that the hearing officer and the other defendants who subsequently failed to overturn the disciplinary sanctions uncritically accepted the conclusion of defendant Gregory and her superiors in DOCS IGP that inmates were not allowed sole possession of blank copies of Form 2133.  (Pl.'s Mem. of Law at 15, Dkt. No. 79-2).[21]  He also argues that he was denied due process when the hearing officer refused plaintiff's request to call DOCS Assistant Commissioner Edward McSweeney as a witness.  (Pl.'s Mem. of Law at 16).

With respect to plaintiff's primary argument, he focuses on the question of whether the DOCS officials involved in imposing disciplinary sanctions against him correctly interpreted DOCS rules and policies in concluding that inmates were prohibited from possessing Form 2133 in blank.  However, plaintiff need not establish that the defendants' interpretation of the DOCS rules and policies was incorrect to sustain a due process claim.  The more relevant question is whether plaintiff had adequate notice that possession of blank copies of Form 2133 would subject him to

---

[21] Plaintiff also claimed that, in filtering plaintiff's questions to the witnesses at the hearing, defendant LaMora rephrased the questions "in a manner that was leading and could only serve to validate the misbehavior report." (Pl.'s Mem. of Law at 16).  The mere fact that plaintiff's questions for witnesses had to be filtered through the hearing officer did not violate due process. *See Baxter v. Palmigiano*, 425 U.S. 308, 322-23 & n.5 (1976) (inmates are not entitled to the right to confront and cross-examine witnesses at a disciplinary hearing).  After reviewing the hearing transcript, the court concludes that there is no factual support for plaintiff's claim that the hearing officer was biased, based on how he rephrased plaintiff's questions to the witnesses at the hearing.  The one time plaintiff objected that the hearing officer failed to ask plaintiff's question, the hearing officer had plaintiff repeat his question and then elicited the requested information from the witness.  (Disc. Hrg. Tr. at 11-12).

discipline.  Plaintiff's conclusory allegations that the hearing officer was biased,

merely because he rejected plaintiff's arguments at the hearing, would be insufficient

to sustain a due process claim.[22]  Accordingly, the court will construe plaintiff's claim

against defendants LaMora and Quinn to advance the stronger argument based on lack

of notice, as discussed above.

Although due process includes a right to call witnesses, this right is also not

unfettered.  *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte*

*v. Real*, 471 U.S. 491, 495 (1985)).  This right may be limited for security reasons, to

keep a hearing within reasonable limits, or on the basis of irrelevance or lack of

necessity.  *Id*. (citing, *inter alia, Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d

Cir. 1991)).  An inmate's due process rights are violated when a prison hearing officer

refuses to interview witnesses without assigning a reason "logically related to

preventing undue hazards to 'institutional safety or correctional goals.'"  *Ponte v.*

*Real*, 471 U.S. at 497.

Plaintiff asked to call, as a witness, DOCS  Executive Deputy Commissioner

Edward Sweeney, the signatory on DOCS Directive 4040 (*see* Pl.'s App. Ex. 6, Dkt.

No. 79-3 at 30-31), which plaintiff argued, supported his argument that inmates were

allowed to possess blank copies of Form 2133.  (Disc. Hrg. Tr. at 4, 19).  Defendant

LaMora denied plaintiff's request to call Mr. Sweeney "because he was not directly

---

[22] *See, e.g., Bunting v. Nagy,* 452 F. Supp. 2d 447, 460-61 (S.D.N.Y. 2006) (in order to
defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something]
more than conclusory allegations of bias and prejudgment" of the disciplinary hearing officer)
(quoting *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir.1989)).

involved with this misbehavior report." (Disc. Hrg. Tr. at 19). The hearing officer made this ruling after hearing from defendant Gregory, who testified that she confirmed, with her superiors at IGP, the interpretation of the DOCS rules to exclude inmates from possessing Form 2133 in blank. (Disc. Hrg. Tr. at 9-10, 13-14). The hearing officer apparently missed or ignored the significant issue of whether plaintiff had adequate notice that possession of a Form 2133 in blank could subject him to discipline. However, on this record, the court finds no factual support for the position that further testimony from another witness, with no involvement in plaintiff's disciplinary case, about the interpretation of the relevant DOCS Directive, was improperly excluded as irrelevant or cumulative.

## IV.    Retaliation Claims

The complaint alleges that remaining defendants LaMora, Gregory, and Bellamy[23] retaliated against plaintiff because of his "protected grievance related activities" by pursuing the disciplinary charges against him. Plaintiff also claims that defendants Annucci, Bellamy, and Quinn are liable for this purported retaliation because they ratified and failed to correct the conduct of the defendants more directly involved in the disciplinary proceedings. (Compl., Dkt. No. 1 at 15). For the reasons discussed below, this court recommends the dismissal of plaintiff's retaliation claims against each remaining defendants, based on the lack of a causal connection between plaintiff's protected conduct and any "adverse action" taken against him, the absence

---

[23] As discussed earlier, plaintiff has formally dismissed or informally withdrawn all claims against C.O. Santamore, who filed the misbehavior report against plaintiff, as well as several other defendants named in the complaint.

of "personal involvement, and/or qualified immunity.

### A.   Legal Standards

#### 1.   Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show first, that he engaged in constitutionally protected speech or conduct, and second, that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  Third, the plaintiff must establish a causal connection between the protected speech or conduct and the adverse action.  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'"  *Gill v. Pidlypchak*, 389 F.3d at 381 (citation omitted).  This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights.  *Id.*

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct.  *Id.*  "Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred."  *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy*

*City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137.

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### 2.    Personal Involvement

For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell*, 9:04-CV-0724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)

(citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

In *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, 556 U.S. 662 (2009).

### 3.   Qualified Immunity

Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official

30

would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted).  Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990).

### B.   Analysis

Plaintiff claims that he was disciplined in retaliation for the filing of a prior civil rights action that was highly critical of the DOCS grievance program, his pursuit of several grievances involving DOCS employees from facilities other than Upstate, and his written criticisms of Upstate employees and DOCS' IGP for their purported failure to properly process various of plaintiff's grievances.  (Compl., Dkt. No. 1 at 12-13; Pl.'s Mem. of Law at 11-12).  Plaintiff's extensive grievance-related activities are both apparent from the record, and not controverted by the defendants.  Plaintiff has therefore established, at least for purposes of the instant motion, that he was engaged in protected activity sufficient to support his First Amendment retaliation claims.  *See, e.g., Ciaprazi v. Goord*, 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *7 (N.D.N.Y. Dec. 22, 2005).

It is clear that the filing of disciplinary charges against an inmate and the imposition of significant disciplinary sanctions would constitute "adverse action" in the context of a retaliation claim.  *Bennett v. Goord*, 343 F.3d at 138.  As discussed

above, the current record does not eliminate material factual issues with respect to whether plaintiff received constitutionally adequate advance notice that his conduct could subject him to discipline.  Accordingly, plaintiff's retaliation claim may not be dismissed at this juncture, as defense counsel argues,[24] on the basis that "it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct" for which he had been cited in a misbehavior report.  *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir.1994).  *Cf. Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (where the record clearly demonstrates that the inmate in fact committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report, the defendants meet their burden of demonstrating proper, non-retaliatory reasons for filing the misbehavior report, and are entitled to summary judgement on a retaliation claim).

However, defense counsel also argues that the retaliation claims against the remaining defendants should be dismissed because there was no causal connection between plaintiff's protected conduct and the disciplinary action against him and because some defendants were not personally involved in any adverse action against plaintiff.  Those arguments require a close examination of the record regarding each remaining defendant.  *Toole v. Connell*, 2008 WL 4186334, at *6 (analysis of retaliation claims requires careful, case-specific, consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two).

---

[24] Defs.' Mem. of Law at 18-20.

### 1.  Defendant Gregory

It is undisputed that, before C.O. Santamore filed his misbehavior report against plaintiff, he contacted defendant Gregory, the Upstate IGP Supervisor, to determine whether inmates were allowed to possess blank copies of grievance Form 2133. (Gregory Decl. ¶ 6; Santamore Decl. ¶¶ 7-8, Dkt. No. 71-24).  It appears that defendant Gregory knew that C.O. Santamore was considering whether to initiate disciplinary proceedings against plaintiff when she advised the correction officer that inmates were not allowed sole possession of Form 2133 in blank.  However, Ms. Gregory did not initiate her involvement in this disciplinary matter, and had no role in the ultimate decision whether or not to file a misbehavior report.  (Gregory Decl. ¶¶ 6-7, 14; Santamore Decl. ¶¶ 7-9 (C.O. Santamore spoke with his area supervisor and "we determined, in the exercise of our professional judgment, that a misbehavior report should be issued to plaintiff"); Disc. Hrg. Tr. at 18).[25]  After the misbehavior report was filed, but before she testified at the hearing,[26] defendant Gregory confirmed with her supervisors at IGP that they agreed with her understanding that DOCS rules and procedures prohibited inmates from having sole possession of blank copies of

---

[25] *See Toole v. Connell*, 2008 WL 4186334, at *6 (based in part on a declaration from the author of a misbehavior report that the decision to issue disciplinary charges was his, and his alone, the court granted summary judgement in favor of other defendants named in a retaliation claim, based on the absence of evidence linking them to the filing of the charge).

[26] Testimony at a disciplinary hearing would not, by itself, suffice to establish personal involvement in the adverse disciplinary action. *See, e.g., Smith v. Baugh*, 3:05-0860, 2007 WL 3179315, at *10 (M.D. Tenn. Oct. 26, 2007) (granting summary judgment on retaliation claims in favor of defendant whose only involvement in the matters appeared to be that he witnessed the incidents that led to the disciplinary charge issued by another officer and ultimately testified to those events at the hearing).

Form 2133.  (Gregory Decl. ¶¶ 8-10; 6/25/2007 E-mail, Dkt. No. 71-20).

Defendant Gregory avers that she was not motivated by any desire to retaliate against plaintiff because of his involvement in filing grievances or lawsuits.  (Gregory Decl. ¶ 12).  She states further that, at the time of her involvement in plaintiff's disciplinary proceedings, she was not aware of plaintiff's lawsuit against various DOCS officials, including the former head of DOCS IGP; and plaintiff acknowledges that he is largely speculating that she knew of his prior lawsuit.  (*Id.*; Pl.'s Dep. at 55).

Plaintiff documents that, in the days and weeks prior to the June 22, 2007 filing of the misbehavior report against him, he wrote several letters to defendant Gregory about grievances relating to other facilities, and wrote a letter to Gregory's superiors at IGP complaining about how she failed properly to process plaintiff's grievances.  (Pl.'s Mem. of Law at 11; Pl.'s App. Exs. 3-4,  Dkt. No. 79-3 at 17-27).  Nonetheless, the court finds there is little or no factual support in the record for plaintiff's conclusory claims that defendant Gregory caused plaintiff to be subject to disciplinary action because of her desire to retaliate against him for his grievance-related activities and/or written criticisms of her.  Plaintiff's contention that a DOCS official who supervises the grievance process in a particular facility would retaliate against an inmate merely because he filed grievances against others, taken to its absurd conclusion, would suggest that the grievance official harbored a retaliatory intent against virtually every inmate she encountered in performing her duties.  *See, e.g.*, *Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for

34

complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases).

The mere temporal proximity of plaintiff's letter criticizing defendant Gregory's handling of his prior grievances and her statements to C.O. Santamore and at the disciplinary hearing about her understanding of the DOCS rules and policies regarding Form 2133, does not support a circumstantial inference of retaliation.  There is no other significant evidence in the record that Ms Gregory was personally involved in causing the adverse action against plaintiff or that she did so because she harbored a retaliatory intent.  *See, e.g., Roseboro v. Gillespie*, 791 F. Supp. 2d at 370 (showing that grievance activity was close in time to the issuance of a misbehavior report, without more, is not sufficient circumstantial evidence of retaliation to survive summary judgment) (collecting cases).

However, even if there were material issues of fact regarding the merits of plaintiff's retaliation claim against defendant Gregory, this court concludes that she should be protected by qualified immunity.  Defendant Gregory's limited role in the disciplinary action against plaintiff was to respond to unsolicited inquiries from corrections officers about her opinion that the DOCS rules and policies precluded inmates from sole possession of blank copies of Form 2133.  Ms. Gregory took pains

35

to confirm her understanding of the applicable DOCS rules and policies with her IGP supervisors before testifying at the hearing, and swears that she still believes that her advice to the disciplinary authorities at Upstate was correct.  (Gregory Decl. ¶¶ 13-16).  The IGP supervisors specifically assured defendant Gregory that they were not concerned that the disciplinary action against plaintiff interfered with his rights to pursue grievances because the misbehavior report was not based on the substance of any grievance.  (6/25/2007 E-mail, Dkt. No. 71-20; Bellamy Decl. ¶¶  9, 14).  At his disciplinary hearing, plaintiff conceded that defendant Gregory "wasn't acting in any kind of malicious [manner]," but claims that she was merely mistaken in interpreting DOCS rules.  (Disc. Hrg. Tr. at 21).  Even giving credit to plaintiff's subsequent, and highly speculative, allegations that defendant Gregory may have harbored some retaliatory intent with respect to plaintiff, she is entitled to qualified immunity.  This court concludes that no rational fact finder could determine that she did not reasonably believe that providing corrections officers with what she understood to be correct information about IGP rules and policies did not violate the plaintiff's First Amendment rights.  *Loria v. Gorman*, 306 F.3d 1271, 1282 (2d Cir. 2002) ("If the officer reasonably believed that his actions did not violate the plaintiff's rights, he is entitled to qualified immunity even if that belief was mistaken.").

### 2.   **Defendant Bellamy**

Several days after C.O. Santamore decided to file a misbehavior report against plaintiff, defendant Gregory, the Upstate IGP supervisor, e-mailed Sheryl English at DOCS IGP, to confirm Gregory's understanding that inmates were not allowed to

possess Form 2133 in blank.  The e-mail specified that the issue arose in the context of the disciplinary charge filed against plaintiff.  (Bellamy Decl. ¶¶ 9, 14; 6/25/2007 E-mail, Dkt. No. 71-20).  Ms. English consulted with defendant Bellamy, the Director of IGP.  Ms. English then advised Ms. Gregory, in a terse e-mail reply, that inmates should not possess blank copies of Form 2133 and that the disciplinary charges did not create any concerns with respect to the particular interests of the IGP.  (*Id.*; English Decl. ¶ 7, Dkt. No. 71-17).  Defendant Gregory stated that the e-mail bolstered her confidence that she had correctly advised C.O. Santamore about the rules relating to Form 2133, and noted that, "if I had learned anything different from Ms. English or Ms. Bellamy, I definitely would have notified C.O. Santamore and the Tier II hearing officer, Lt. Randy LaMora, of what I learned."  (Gregory Decl. ¶ 10).

As discussed above, the ultimate authority and responsibility for initiating and adjudicating the disciplinary charges resided with C.O. Santamore and Lt. LaMora. Defendant Bellamy's very peripheral, after-the-fact role in advising defendant Gregory before she testified at plaintiff's Tier II hearing does not constitute sufficient "personal involvement" in the adverse action against plaintiff–the disciplinary action–to make her liable on the retaliation claim.[27]

---

[27] Defendant Bellamy later responded to several letters in which plaintiff complained about the discipline imposed on him for trying to obtain blank copies of Form 2133.  (Pl.'s App. Exs. 21-26, Dkt. No. 79-5 at 4-25).  Her responses with respect to the disciplinary action against plaintiff stated only that plaintiff's recourse was limited to the disciplinary appeal process.  (Pl.'s App. Exs. 22, 24, 26, Dkt. No. 79-5 at 13, 19, 25; Bellamy Decl. ¶ 16).  Based on the legal authority discussed below in section IV B 5., addressing defendant Annucci, these limited responses of defendant Bellamy to plaintiff's complaints are also not sufficient to establish her personal involvement with respect to his retaliation claims.

Even if defendant Bellamy had been personally involved in any adverse action against plaintiff, there is insufficient factual support for plaintiff's conclusory allegations that she supported the disciplinary proceedings against him in retaliation for his extensive complaints about the DOCS grievance program and his pursuit of a lawsuit against the prior IGP Director.  (Pl.'s Mem. of Law at 11-12; Pl.'s Dep. at 25-31).  Ms. Bellamy testified that she was not aware, at the time the disciplinary action was taken against plaintiff in June 2007, that he was a vocal critic of her department. (Bellamy Dep. at 9, Dkt. No. 79-4 at 44).  Defendant Bellamy also testified that she was unaware, in June 2007, of plaintiff's prior lawsuit against her predecessor at IGP, and was not deposed in that action until more than six months after plaintiff was disciplined.  (Bellamy Dep. at 9; Bellamy Decl. ¶ 15).  Ms. Bellamy explicitly denied that she harbored a retaliatory intent with respect to plaintiff or any other inmate who filed grievances or initiated lawsuits.  (Bellamy Decl. ¶ 15).  Given that defendant Bellamy oversaw the program through which thousands of DOCS inmates regularly register their grievances and complaints, it is difficult to credit the conclusory claim that she retaliated against this particular plaintiff for criticizing, or even filing a lawsuit, with respect to her program.

In any event, even if there were material issues of fact on the current record with respect to the retaliation claim against defendant Bellamy, she, like defendant Gregory, should be protected by qualified immunity.  The defendant may raise valid issues about whether he had adequate notice that his conduct would violate disciplinary rules.  However, IGP Director Bellamy provides a sincere and

penologically rational defense of why she concluded that DOCS rules do not authorize inmates to possess, unsupervised, Form 2133 in blank.  (Bellamy Decl. ¶¶ 10-14, 17).[28]  As defense counsel argues, an agency's interpretation of its own regulations "is entitled to substantial deference 'unless it is plainly erroneous or inconsistent with the regulation.'"  *Bergamo v. Commodity Futures Trading Com'n,* 192 F.3d 78, 79-80 (2d Cir. 1999) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).  The court concludes that no reasonable fact finder could determine that Ms. Bellamy did not reasonably believe that providing what she felt to be a valid and appropriate interpretation of IGP rules and policies, when requested to do so by other DOCS officials involved in a disciplinary action, would not violate plaintiff's First Amendment rights.

### 3.    Defendant LaMora

As the officer who conducted the disciplinary hearing, defendant LaMora would have been "personally involved" with respect to any purported violations of plaintiff's constitutional rights relating to the disciplinary action.  *See, e.g., Ramsey v. Goord*, 05-CV-47A, 2005 WL 2000144, at *5 (W.D.N.Y. Aug. 13, 2005).  However, plaintiff's allegations that defendant LaMora knew of plaintiff's prior lawsuit and other grievance-related activities (none of which was directed at Lt. LaMora), and that the hearing officer retaliated against plaintiff because of that protected conduct, are

---

[28] Director Bellamy's interpretation was informed by the purported institutional concern that, if inmates were allowed unsupervised access to blank copies of a form that had a space for a decision and signature of a facility Superintendent, that "could lead to inmates forging the signatures of the superintendent and thereby deceiving the . . . CORC as to the true reason(s) for the denial of a grievance appeal at the superintendent level."  (Bellamy Decl. ¶ 11).

supported by little more than speculation.  (Pl.'s Dep. at 17-23).  Plaintiff testified that

he believed defendant LaMora would have been aware of prior grievances and

lawsuits against other DOCS employees because Lt. LaMora previously worked at

other nearby facilities with some of the subjects of plaintiff's prior grievance and

actions.  (Pl.'s Dep. at 18, 20).  Plaintiff also claimed that the "bias and hostility" that

Lt. LaMora demonstrated during the hearing reflected his retaliatory motives.  (Pl.'s

Dep. at 23).  Plaintiff did not offer any details about statements by Lt. LaMora that

showed his awareness of plaintiff's prior grievance-related activities or demonstrated

his hostility against plaintiff.  (Pl.'s Dep. at 19-20).  The court finds no evidence of

any retaliatory animus on the part of Lt. LaMora in the disciplinary hearing transcript,

other than plaintiff's general and unsupported claims of inappropriate conduct and

statements by the hearing officer.  (*See, e.g.*, Disc. Hrg. Tr. at 4, 6, 26, 29).

Defendant LaMora has stated that, at the time of the hearing, he was not aware

of plaintiff's prior lawsuit and "had no concern whatsoever about plaintiff's use of the

grievance system."  (LaMora Decl. ¶ 10, Dkt. No. 71-26)  Even if Lt. LaMora had

some awareness that plaintiff was actively involved in pursuing grievances and

lawsuits against other DOCS employees, plaintiff's conclusory allegations of

retaliation by this defendant are not sufficient to survive summary judgment.  See,

e.g., *Ciaprazi v. Goord*, 2005 WL 3531464, at *8-9 (granting summary judgment and

dismissing retaliation claim based only on plaintiff's conclusory allegations that the

manifest falsity of the misbehavior report and testimony during the disciplinary

hearing indicated the disciplinary matters were motivated by retaliatory animus due to

40

grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action); *Roseboro v. Gillespie*, 791 F. Supp. 2d at 369, 372 (even assuming that Counselor Wingate knew about plaintiff's grievance against C.O. Gillespie, plaintiff has failed to provide any basis to believe that Ms. Wingate retaliated for a grievance that she was not personally named in) (collecting cases).

### 4.   Defendant Quinn

Defendant Quinn reviewed and denied plaintiff's appeal of the disciplinary sanctions.  Hence, there is at least a material issue of fact as to whether Capt. Quinn was "personally involved" with respect to any purported violations of plaintiff's constitutional rights relating to the disciplinary action.[29]  However, as with Lt. LaMora, plaintiff offers little more than speculation that Capt. Quinn was aware of plaintiff's grievance-related activity or that he harbored any retaliatory animus because of plaintiff's protected conduct.

Capt. Quinn avers that he was unaware of plaintiff's lawsuit against other DOCS employees at the time he reviewed the disciplinary appeal, and had no concerns about plaintiff's pursuit of grievances against others.  (Quinn Decl. ¶ 11).  In his

---

[29] In *Williams v. Smith*, 781 F.2d at 324, the Second Circuit held that a prison superintendent who affirmed plaintiff's disciplinary punishment on appeal was "personally involved" in alleged due process violations committed at the disciplinary hearing.  "[D]istrict courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official 'proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results.'"  *Gantt v. Lape*, 9:10-CV-83 (GTS/GHL), 2011 WL 673783, at *3 (N.D.N.Y.  Jan. 18, 2011 ) (Report-Recommendation), adopted, 2011 WL 673782 (N.D.N.Y. Feb. 17, 2011).  Capt. Quinn's own description of his handling of plaintiff's appeal indicates that he carefully reviewed plaintiff's disciplinary proceedings and did not merely rubber-stamp the results, all of which tends to demonstrates that he was "personally involved." (Quinn Decl. ¶¶ 7-10, Dkt. No. 71-29).

deposition, plaintiff offered no reason to think that defendant Quinn was aware of, or aggravated by, plaintiff's grievance-related activities towards others; plaintiff claimed only that Capt. Quinn "ratified the retaliatory conduct that I was subjected . . . to." (Pl.'s Dep. at 15-16).  Plaintiff's appeal papers complained that the hearing officer wrongly accepted the "mistaken" testimony of defendant Gregory that DOCS rules prohibited inmates from sole possession of Form 2133 in blank, and raised several "procedural objections" to the conduct of the hearing.  However, plaintiff did not allege, during the disciplinary hearing or in his appeal papers, that any of the participants in the disciplinary process were retaliating against plaintiff because of his prior pursuit of grievances or legal actions.  (Pl.'s App. Ex. 10, Dkt. No. 79-3 at 42-52).[30]  Based on the authority cited above, plaintiff's conclusory allegations that Capt. Quinn denied plaintiff's disciplinary hearing based on a retaliatory motive are not sufficient to overcome summary judgment.

### 5.    Defendant Annucci

DOCS Commissioner Brian Fischer delegated to Executive Deputy Commissioner Anthony J. Annucci the responsibility to address plaintiff's letter/

---

[30] Plaintiff did state, in his appeal papers, that disciplining him for trying to obtain a blank copy of Form 2133 constituted a "reprisal" against him for good faith utilization of the grievance process.  (Pl.'s App. Ex. 10, Dkt. No. 79-3 at 45).  However, it is clear from the transcript of the disciplinary hearing that this statement related to plaintiff's argument that he should not be disciplined because he intended to use the blank Form 2133 in good faith to appeal a prior grievance for which he had not received a timely Superintendent's response.  (Disc. Hrg. Tr. at 20-21 ("So clearly [Mrs. Gregory] wasn't acting in any kind of malicious manner, I don't believe, either.  However; I believe both Mrs. Gregory and her supervisor are mistaken. . . .  I would note that I was acting in good faith which the directive clearly says I can not be disciplined for acting in good faith.")).

memorandum dated September 12, 2007.  (Fischer Decl. ¶¶ 17-21, Dkt. No. 71-4 &

Ex. B, Dkt. No. 71-6).  Plaintiff's letter complained that he was disciplined for

attempting to secure a blank copy of Form 2133 in retaliation for his grievance-related

activities.  Plaintiff's letter also argued that the disciplinary action was an abuse of

authority that violated his civil rights because it was inconsistent with DOCS

regulations and fundamentally unfair.  (Fischer Decl., Ex. B).  Defendant Annucci

responded, by letter dated November 30, 2007, stating that plaintiff's only redress was

his appeal of the disciplinary action and that Annucci's office lacked the authority to

modify or vacate the discipline imposed.  (Annucci Decl. ¶¶ 7-8, Dkt. No. 71-9 & Ex.

A, Dkt. No. 71-10).[31]

The failure of a supervisory official to investigate a letter of protest written by

an inmate is insufficient to establish personal involvement.  *Smart v. Goord*, 441 F.

Supp. 2d 631, 642–643 (S.D.N.Y. 2006).  Mere notice of alleged wrongdoing is

insufficient to establish a supervisor's or administrator'[s] personal involvement.

*Gibson v. Com'r of Mental Health*, No. 04 Civ. 4350, 2008 WL 4276208, at *8,

(S.D.N.Y. Sept. 17, 2008).  While mere receipt of a letter from a prisoner is

insufficient to establish individual liability, personal involvement will be found, at

least in some cases, "where a supervisory official receives and acts on a prisoner's

grievance or otherwise reviews and responds to a prisoner's complaint.'"  *Boddie v.*

---

[31] For a Tier II hearing, an inmate may appeal only to the Superintendent of the Facility, not to the Commissioner of DOCS.  7 N.Y.C.R.R. § 253.8.  The Commissioner's office "would never be involved in the review of Tier II disciplinary proceedings."  *Roberts v. Fischer*, 9:09-CV-750 (LEK/ATB), 2010 WL 2869796, at *5 (N.D.N.Y. June 28, 2010) (Report-Recommendation), adopted, 2010 WL 2869766 (N.D.N.Y. July 19, 2010).

*Morgenthau*, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (quoting *Johnson v. Wright*,

234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002).

 Defendant Annucci, and other DOCS officials including defendant Bellamy, did

respond to plaintiff's letters of complaint about the discipline imposed on him.

However, those responses merely advised plaintiff that his recourse was limited to his

appeal of the disciplinary action, which had already been denied, and that no further

action would or could be taken by DOCS supervisory officials on his behalf.  These

limited responses, which involved no meaningful review or investigation of plaintiff's

complaints by the supervisory officials, and essentially refused his demands for further

investigation and remedial action, are not sufficient to establish "personal

involvement" on the part of defendant Annucci or any other DOCS officials who

responded in the same fashion.  *See, e.g., Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.

1997) (the response of the DOCS Commissioner to an inmate plaintiff's letter, merely

advising that another DOCS official had decided plaintiff's appeal from an

administrative segregation hearing, supported the grant of summary judgment in favor

of the Commissioner based on his lack of "personal involvement"); *Rivera v. Fischer*,

655 F. Supp. 2d 235, 238-39 (W.D.N.Y. 2009) (DOCS Deputy Commissioner, who

received inmate's letters from the Commissioner and then passed them on to others for

review, was not "personally involved" by virtue of sending a response to an inmate

based on the report that had been given by the subordinate to whom the matter had

been referred); *Allah v. Poole*, 506 F. Supp. 2d 174, 193 (W.D.N.Y. 2007) (defendant

Napoli received inmates letter from defendant Poole, and then responded, by letter to

44

the inmate, that his complaint had been investigated by a Lt. Gianno and found to be meritless; "[n]one of these letters show personal involvement on Napoli's or Poole's part").[32]

WHEREFORE, based on the findings above, it is

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 71) be denied in part, without prejudice to renewal, with respect to plaintiff's due process claims against defendants LaMora and Quinn, based on the alleged lack of adequate notice that plaintiff's conduct violated DOCS disciplinary rules; and it is further

RECOMMENDED, that defendants' motion for summary judgment otherwise be granted, and that all other claims and defendants in plaintiff's complaint be dismissed.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

---

[32] Some district court cases from this Circuit, including *Boddie v. Morgenthau* and *Johnson v. Wright*, both of which involved motions to dismiss, contain broad language which suggests that any response to a prisoner's letter of complaint is sufficient to establish "personal involvement." Particularly in the context of a summary judgment motion, the inquiry about whether personal involvement is shown by a prison official's response to an inmate letter or grievance is more nuanced. *See, e.g.*, *Walker v. Pataro*, 99 CIV. 4607, 2002 WL 664040, at *14 (S.D.N.Y. Apr. 23, 2002) (responses to inmate complaints which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement, while responses that do little more than provide information, *e.g.*, about prior decisions by others, do not establish personal involvement) (citing, *inter alia*, *Sealy v. Giltner*, 116 F.3d at 51); *Charles v. New York State DOCS*, 9:07-CV-1274 (DNH/GJD), 2009 WL 890548, at *6 (N.D.N.Y. Mar. 31, 2009) ("Basically, the cases make clear that the determination of personal involvement based on a letter of complaint to a supervisor . . . often depends upon the contents of the letter and whether the supervisor referred the letter to a subordinate officer or whether the supervisory official investigated and decided the issue him or herself").

fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  January 31, 2012

Hon. Andrew T. Baxter
U.S. Magistrate Judge